UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ARACELIS VAZQUEZ,

      Plaintiff,

v.                                      Case No. 2:20-cv-540-NPM

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

_____

## OPINION AND ORDER

Plaintiff Aracelis Vazquez seeks judicial review of a denial of Social Security disability benefits. The Commissioner of the Social Security Administration filed the transcript of the proceedings (Doc. 14), [1] and the parties filed a Joint Memorandum (Doc. 27). As discussed in this opinion and order, the decision of the Commissioner is reversed and remanded.

## I.    Eligibility for Disability Benefits and the Administration's Decision

### A.    Eligibility

The Social Security Act and related regulations define disability as the inability to do any substantial gainful activity by reason of one or more medically determinable physical or mental impairments that can be expected to result in death

---

[1] Cited as "Tr." followed by the appropriate page number.

or that have lasted or can be expected to last for a continuous period of not less than twelve months.[2] Depending on its nature and severity, an impairment limits exertional abilities like walking or lifting, nonexertional abilities like seeing or hearing, tolerances for workplace conditions like noise or fumes, or aptitudes necessary to do most jobs such as using judgment or dealing with people.[3] And when functional limitations preclude both a return to past work and doing any other work sufficiently available in the national economy (or an impairment meets or equals the severity criteria for a disabling impairment as defined in the regulatory "Listing of Impairments"), the person is disabled for purposes of the Act.[4]

**B.    Factual and procedural history**

Vazquez applied for a period of disability and disability insurance benefits on November 10, 2017, and she applied for supplemental security income on November 21, 2017. (Tr. 110, 129, 166-167, 258, 265). In her disability insurance benefits application, Vasquez asserted an onset date of January 2, 2017. (Tr. 94, 130, 265). And in her supplemental security income application, Vazquez initially asserted an onset date of December 20, 2016. (Tr. 111, 258). However, between the initial and

---

[2] *See* 42 U.S.C. §§ 416(i), 423(d), 1382c(a)(3); 20 C.F.R. §§ 404.1505, 416.905.

[3] *See* 20 C.F.R. §§ 404.1513(a)(2)(i)-(iv) (discussing the various categories of work-related abilities), 416.913(a)(2)(i)(A)-(D) (same), 404.1522(b) (providing examples of abilities and aptitudes necessary to do most jobs), 416.922(b) (same), 404.1545(b)-(d) (discussing physical, mental, and other abilities that may be affected by an impairment), 416.945(b)-(d) (same), 404.1594(b)(4) (defining functional capacity to do basic work activities), 416.994(b)(1)(iv) (same).

[4] *See* 20 C.F.R. §§ 404.1511, 416.911(a).

reconsideration levels, she appears to have amended her onset date to January 2, 2017, for supplemental security income. (Doc. 111, 148). Vazquez alleged disability due to the following conditions: chronic fatigue; dizziness; arthralgia; positive ANA (antinuclear antibody); chronic diarrhea; epigastric pain; fibromyalgia; radiculopathy, cervical region; paresthesia of skin; and carpal tunnel syndrome. (Tr. 94-95, 111-112, 131, 149). As of the alleged onset date (January 2, 2017), Vazquez was 36 years old with at least a high school education. (Tr. 31, 52, 94, 130, 148, 274). Her past work includes jobs as a leasing agent (Tr. 83), housekeeper (Tr. 52-53, 58, 84, 274), bartender (Tr. 62, 84), and cashier (Tr. 55-56, 84). (*See also* Tr. 31).

Vazquez's applications were denied initially on February 5, 2018 (disability insurance benefits), and June 6, 2018 (supplemental security income), and upon reconsideration on July 27, 2018 (both). (Tr. 108-110, 127-129, 146-147, 164-167). At her request, Administrative Law Judge ("ALJ") Eric Anschuetz held a hearing on September 12, 2019. (Tr. 39-93, 192-193). Vazquez testified with the assistance of a Spanish interpreter. (Tr. 41, 384).

The ALJ issued an unfavorable decision on October 28, 2019, finding Vazquez not disabled from January 2, 2017, through the date of the decision. (Tr 15-33). Vazquez's timely request for review by the administration's Appeals Council was denied. (Tr. 1-5). She then brought the matter to this court, and the case is ripe

for judicial review. The parties consented to proceed before a United States Magistrate Judge for all proceedings. (*See* Doc. 18).

## C.   The ALJ's decision

An ALJ must perform a "five-step sequential evaluation" to determine if a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1). This five-step process determines:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether these impairments meet or equal an impairment listed in the Listing of Impairments; (4) if not, whether the claimant has the residual functional capacity ("RFC") to perform [her] past relevant work; and (5) if not, whether, in light of [her] age, education, and work experience, the claimant can perform other work that exists in significant numbers in the national economy.

*Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 933 (11th Cir. 2015) (internal quotation omitted); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The governing regulations provide that the Social Security Administration conducts this "administrative review process in an informal, non-adversarial manner." 20 C.F.R. §§ 404.900(b), 416.1400. Unlike judicial proceedings, SSA hearings "are inquisitorial rather than adversarial." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1364 (11th Cir. 2018) (quoting *Sims v. Apfel*, 530 U.S. 103, 111 (2000) (plurality opinion)). "Because Social Security hearings basically are inquisitorial in nature, '[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.'" *Id*. Indeed, "at the hearing stage,

4

the Commissioner does not have a representative that appears 'before the ALJ to oppose the claim for benefits.'" *Id.* (quoting *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000)). "Thus, 'the ALJ has a basic duty to develop a full and fair record. This is an onerous task, as the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'" *Id.* (quoting *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015)).

Nonetheless, while the claimant is temporarily relieved of the burden of production during step five as to whether there is a sufficient number of jobs the claimant can perform, the claimant otherwise has the burdens of production and persuasion throughout the process. *See* 20 C.F.R. §§ 404.1512, 416.912 (providing that the claimant must prove disability); *see also Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983) ("The scheme of the Act places a very heavy initial burden on the claimant to establish existence of a disability by proving that he is unable to perform his previous work."). In short, "the overall burden of demonstrating the existence of a disability as defined by the Social Security Act unquestionably rests with the claimant." *Washington*, 906 F.3d at 1359 (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1280 (11th Cir. 2001)).

In this matter, the ALJ found Vazquez met the insured status requirements through December 31, 2021. (Tr. 24). At step one of the evaluation, the ALJ found Vazquez had not engaged in substantial gainful activity since her alleged onset date.

(Tr. 24). At step two, the ALJ characterized Vazquez's severe impairments as: degenerative disc disease; undifferentiated connective tissue disease; localized symptomatic epileptic syndrome with simple partial seizures; carpal tunnel syndrome; fibromyalgia; and depressive disorder. (Tr. 24). At step three, the ALJ determined Vazquez did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (Tr. 24).

As the predicate to step four, the ALJ arrived at the following RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR [§§] 404.l567(b) and 416.967(b) except the claimant can lift and/or carry a maximum of 10 pounds. The claimant can stand, walk, or sit for 6 hours in an 8-hour workday. The claimant has an unlimited ability to climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. The claimant has an unlimited ability to balance, but can only frequently stoop, kneel, crouch, and crawl. The claimant must avoid workplace hazards such as unprotected heights and unshielded rotating machinery. The claimant can frequently use her bilateral hands for fingering and fine manipulation. The claimant is limited to simple, routine, and repetitive tasks. The claimant can tolerate occasional interaction with supervisors, coworkers, and the public.

(Tr. 26). Consequently, at step four, the ALJ determined Vazquez was not capable of performing her past relevant work. (Tr. 31). At step five, the ALJ found Vazquez could perform other work that exists in significant numbers in the national economy. In support, a vocational expert opined during the ALJ hearing that three occupations represent the kinds of jobs that an individual with Vazquez's age, education, work experience, and RFC could perform:

- routing clerk, DOT 222.687-022, light exertional level, SVP 2, with 94,000 jobs available in the nation;

6

- power screwdriver operator, DOT 699.685-026, light exertional level, SVP 2, with 311,000 jobs available in the nation; and

- marker, DOT 209.587-034, light exertional level, SVP 2, with 310,000 jobs available in the nation.

(Tr. 32).[5]

## II.   Analysis

The issue on appeal is whether the ALJ properly considered Vazquez's subjective allegations of fibromyalgia-related symptoms and limitations. (Doc. 27, p. 26).

### A.   Standard of review

The court "may not decide the facts anew, make credibility determinations, or reweigh the evidence." *Buckwalter v. Acting Comm'r of Soc. Sec.*, 997 F.3d 1127, 1132 (11th Cir. 2021). While the court must account for evidence both favorable and unfavorable to a disability finding and view the evidence as a whole, *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), the court's review of the administration's decision is limited to determining whether "it is supported by substantial evidence and based on proper legal standards." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). "Substantial evidence is more than a scintilla and is

---

[5] The DOT numbers refer to the *Dictionary of Occupational Titles* and its detailed explanations concerning each occupation's requirements. These descriptions include exertion and skill levels. Exertion refers to the work—in a purely physical sense—that the job requires, and it is divided into five categories: sedentary, light, medium, heavy, and very heavy. Skill refers to how long it takes to learn the job, and it is divided into three categories: unskilled, semiskilled, and skilled. The "SVP" (Specific Vocational Preparation) provides further subdivision of the three skill categories into nine levels: SVP 1 and 2 are unskilled; SVP 3 and 4 are semiskilled; and SVP 5 through 9 are skilled.

such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1280 (11th Cir. 2020) (quoting *Crawford*, 363 F.3d at 1158)).

"[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The inquiry is "case-by-case," and "defers to the presiding ALJ, who has seen the hearing up close." *Id.* at 1157. In other words, a "presumption of validity attaches" to the ALJ's factual findings. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). And if supported by substantial evidence, the ALJ's findings of fact are conclusive. 42 U.S.C. § 405(g). This means the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the court finds that the evidence "preponderates against" the agency's decision. *Noble v. Comm'r of Soc. Sec.*, 963 F.3d 1317, 1323 (11th Cir. 2020) (quoting *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991)).

### B.   Whether the ALJ properly considered Vazquez's subjective allegations of fibromyalgia-related symptoms and limitations

Vazquez argues the reasons the ALJ provided for rejecting the allegations of fibromyalgia-related symptoms and limitations is cause for reversal. (Doc. 27, p. 26). The court agrees.

The ALJ found fibromyalgia was a severe impairment at step two. (Tr. 24). When assessing Vazquez's RFC, the ALJ found that Vazquez's "medically determinable impairments could reasonably be expected to cause the alleged

symptoms." (Tr. 30). However, the ALJ determined Vazquez's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 30). He further explained that "[a]lthough the record shows that [Vazquez] has some health-related issues, it contains no consistent evidence showing that [her] impairments are of the type or nature that would preclude all employment." (Tr. 30).

Fibromyalgia is "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissue that has persisted for at least 3 months." SSR 12-2p, 2012 WL 3104869, *2 (July 25, 2012). The Eleventh Circuit has recognized that fibromyalgia is a unique impairment because it "'often lacks medical or laboratory signs and is generally diagnosed mostly on a[n] individual's described symptoms.'" *Horowitz v. Comm'r of Soc. Sec.*, 688 F. App'x 855, 863 (11th Cir. 2017) (quoting *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005)). "Because the 'hallmark' of fibromyalgia is a 'lack of objective evidence,' a claimant's subjective complaints may be the only means of determining the severity of the claimant's condition and the functional limitations she experiences." *Id.* (citing *Moore*, 405 F.3d at 1211). So for fibromyalgia claims, an ALJ's decision is subject to reversal when the ALJ relies on lack of objective findings as a basis for an adverse decision. *Id.*

Social Security Ruling (SSR) 12-2p provides guidance for determining whether a person has a medically determinable impairment of fibromyalgia and any functionally limiting effects. 2012 WL 3104869 at *1; *Francis v. Saul*, No. 8:18-cv-2492-SPF, 2020 WL 1227589, *3 (M.D. Fla. Mar. 13, 2020). The ruling informs how ALJs will consider fibromyalgia in the five-step process. SSR 12-2p, 2012 WL 3104869 at *5-6.

When assessing a claimant's RFC, an ALJ must consider all relevant evidence in the case and all of a claimant's medically determinable impairments, including those that are not severe. SSR 12-2p, 2012 WL 3104869 at *6. "For a person with [fibromyalgia], [an ALJ] will consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" *Id.* Part of the evidence an ALJ must consider is the claimant's subjective complaints of disabling pain and other symptoms.

When considering a claimant's subjective complaints, an ALJ must follow a two-step process. *Id.* at *5. [6] First, the claimant must provide evidence of an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the claimant's symptoms, such as pain. Second, the ALJ must evaluate the intensity and persistence of those symptoms to determine

---

[6] SSR 12-2p expressly states that the administration will follow the two-step process set forth in the regulations and in SSR 96-7p. After the promulgation of SSR 12-2p, SSR 96-7p was rescinded and replaced by SSR 16-3p, 2017 WL 5180304, *1 (Oct. 25, 2017).

the extent to which the symptoms limit the claimant's ability to perform work-related activities. *Id.*; SSR 16-3p, 2017 WL 5180304, *3-4 (Oct. 25, 2017).

If the objective medical evidence does not substantiate the claimant's statements about the intensity, persistence, and functionally limiting effects of symptoms, then the ALJ must consider other evidence in the record to determine if, and to what extent, the claimant's symptoms limit her ability to do work-related activities. This other evidence includes a claimant's daily activities; the location, duration, frequency, and intensity of the individual's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication taken to relieve the symptoms; treatment, other than medication, for the symptoms; any other measure used to relieve the symptoms; and any other factors concerning functional limitations and restrictions due to the symptoms. *See* 20 C.F.R. §§ 404.1529(c), 404.1545(a)(3), 416.929(c), 416.945(a)(3); *see also* SSR 12-2p, 2012 WL 3104869 at *5; SSR 16-3p, 2017 WL 5180304 at *7-8.

The regulations provide that, normally, a claimant's statements about her pain or other symptoms, alone, will not establish disability; there must also be objective medical evidence. *See* 20 C.F.R. §§ 404.1529(a)-(b), 416.929(a)-(b). While the same pain standard is applied for fibromyalgia, the Eleventh Circuit has loosened the need for objective medical evidence to establish fibromyalgia. This is "[b]ecause the 'hallmark' of fibromyalgia is a 'lack of objective evidence,' [such that] a claimant's

subjective complaints may be the only means of determining the severity of [her] condition and the functional limitations she experiences." *Horowitz v. Comm'r of Soc. Sec.*, 688 F. App'x 855, 863 (11th Cir. 2017) (citing *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (noting that courts will reverse an ALJ's determination that a fibromyalgia claimant's testimony was incredible based on the lack of objective evidence documenting the impairment)); *see also Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 64 (11th Cir. 2010) ("The lack of objective clinical findings is, at least in the case of fibromyalgia, therefore insufficient alone to support an ALJ's rejection of a treating physician's opinion as to the claimant's functional limitations."); *Smith v. Astrue*, No. 4:10-cv-472-MP/WCS, 2011 WL 5026218, *20 (N.D. Fla. Sept. 16, 2011), report and recommendation adopted, No. 4:10-cv-00472-MP-WCS, 2011 WL 5026212 (N.D. Fla. Oct. 21, 2011) ("It is a misunderstanding of the nature of fibromyalgia to require objective evidence for a disease that eludes such measurement.") (citations and quotations omitted).

The ALJ summarized Vazquez's statements and testimony. In relevant part, Vazquez alleged she experienced back pain, knee pain, leg pain, elbow pain, and face pain, all due to fibromyalgia. (Tr. 27, 74). She also attributed memory problems and fatigue to her fibromyalgia because they are side effects of her medications. (Tr. 74-75). As for medical evidence, there are diagnoses of fibromyalgia, treatment notes (including examination findings), and opinion evidence. (Tr. 28-30, 430, 482).

But the ALJ concluded Vazquez's subjective statements were not entirely consistent with the evidence. (Tr. 30). He reasoned as follows:

> Although the record shows that the claimant has some health-related issues, it contains no consistent evidence showing that the claimant's impairments are of the type or nature that would preclude all employment by the claimant and thus require a finding of disability at any point during the period under review.
>
> The claimant's medical history is not necessarily consistent with her allegation of disability, as the record does not reflect the level of medical treatment one would expect for a disabled individual. For instance, the claimant rarely sought or received treatment, and the treatment received was relatively conservative. In addition, the claimant takes medication for the alleged impairments, which weighs in the claimant's favor, but the limited medical record reveals that when compliant, the medications have been relatively effective in controlling the claimant's symptoms. Further, the medical evidence of record consistently indicated relatively normal to mild examination findings.

(Tr. 30).

While Vazquez contends that the ALJ's decision is deficient for "neither mention[ing] SSR 12-2p nor follow[ing] the analysis directed therein," (Doc. 27, p. 28), SSR 12-2p does not state that an ALJ must expressly mention or cite SSR 12-2p to fulfill his obligations when considering a claimant's fibromyalgia. *See* SSR 12-2p, 2012 WL 3104869. Still, an ALJ's omission of any mention of SSR 12-2p can be a tell-tale sign of error in matters that call for its application. *See, e.g.*, *Hoffmeyer v. Comm'r of Soc. Sec.*, No. 6:19-cv-981-Orl-EJK, 2020 WL 5757999, *4 (M.D. Fla. Sept. 28, 2020); *Catalan v. Berryhill*, No. 8:17-cv-1425-T-30MAP, 2018 WL 4055340, *3 (M.D. Fla. Aug. 9, 2018), report and recommendation

adopted, No. 8:17-cv-1425-T-30MAP, 2018 WL 4052276 (M.D. Fla. Aug. 24, 2018); *Morgan v. Comm'r of Soc. Sec.*, No. 8:14-cv-305-T-DNF, 2015 WL 1311062, *7 (M.D. Fla. Mar. 24, 2015); *cf. Derrick v. Soc. Sec. Admin., Comm'r*, No. 21-13388, 2022 WL 791710, *5 (11th Cir. Mar. 16, 2022) ("The ALJ cited to SSR 12-2p in his decision, further indicating that he properly evaluated Derrick's fibromyalgia.").

The ALJ proceeded through the two-step process for considering Vazquez's subjective statements. He found the objective medical evidence did not substantiate Vazquez's statements about the intensity, persistence, and functionally limiting effects of symptoms. Although the ALJ did not refer to SSR 12-2p, the ALJ considered other evidence to determine if, and to what extent, Vazquez's symptoms limit her ability to do work-related activities. Specifically, the ALJ considered: (1) the level of medical treatment, including the frequency and nature of treatment; (2) medications; and (3) examination findings. (Tr. 30). The primary issue is whether the above-cited reasons provided by the ALJ comport with SSR 12-2p's framework and are based upon substantial evidence.

### 1. *Examination findings*

One reason the ALJ proffered for discrediting Vazquez's subjective complaints was that "the medical evidence of record consistently indicated relatively normal to mild examination findings." (Tr. 30). Had the ALJ solely proffered this

reason, precedent would command remand because "the 'hallmark' of fibromyalgia is a 'lack of objective evidence.'" *See supra* discussion p. 12; *Horowitz v. Comm'r of Soc. Sec.*, 688 F. App'x 855, 863 (11th Cir. 2017). Moreover, this reason contravenes the spirit of SSR 12-2p "because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" SSR 12-2p, 2012 WL 3104869 at *6. It is for this reason that it is imperative for an ALJ to consider the longitudinal record. *Id.*

Here, the ALJ acknowledged Vazquez had confirmed diagnoses for fibromyalgia, the first record of which was as early as June 21, 2017. (Tr. 28, 430, 482, 490). The ALJ also referenced Vazquez's treatment records in which she reported physical symptoms, including those associated with fibromyalgia. (Tr. 28). Specifically, Vazquez's records show she complained of joint pain, joint swelling, elbow pain, muscle aches, diffuse body aches, back pain, weakness, arthralgias, myalgias, fatigue, and numbness and tingling in her hands and fingers. (Tr. 28, 429, 432, 436, 527, 545, 641, 973, 1040, 1055). In contrast, the ALJ also cited a January 2017 record in which Vazquez reported no joint swelling, no joint stiffness, and no lightheadedness (Tr. 416), and a November 2018 record in which Vazquez reported she was doing much better (Tr. 1074). (Tr. 28).

The ALJ recognized that the treatment records confirmed Vazquez's reported symptoms upon physical examination, sometimes showing enlarged right-hand

joints, myofascial body pain, tenderness, joint pain upon movement, various tender points (with some examinations showing "more than 8 tender points" – the requisite number to indicate fibromyalgia), and positive Phalen's and Tinel's signs,[7] among other findings. (Tr. 28, 426, 433, 467, 477, 527, 497, 644, 1058, 1078). The ALJ also noted objective imaging showing cervical lordosis, osteophytic spurring, mild spondylosis, and bilateral wrist neuropathy (Tr. 28, 338, 530, 541). In contrast, the ALJ cited examination findings indicating "relatively unremarkable findings," including no acute distress, no edema, no back tenderness, no musculoskeletal tenderness, and normal musculoskeletal range of motion, negative straight leg raise, and negative left wrist findings. (Tr. 28, 413, 417, 430, 446, 477, 540, 559, 1043). The ALJ also referenced variations in both subjective reports and examination findings regarding Vazquez's mental health. (Tr. 28-29).

In short, there was objective evidence that both supported and contradicted Vazquez's subjective complaints. But the ALJ's statement that the medical evidence "***consistently*** indicated relatively normal to mild examination findings" is not

---

[7] The Phalen and Tinel tests are a common tool for physicians to diagnose carpel tunnel syndrome. The diagnosis of carpal tunnel syndrome is strongly suggested by the Tinel sign, in which median nerve paresthesias are reproduced by tapping at the volar surface of the wrist over the site of the median nerve in the carpal tunnel. Reproduction of tingling with wrist flexion (Phalen sign) or with direct pressure on the nerve at the wrist in a neutral position (median nerve compression test) is also suggestive.

*See* David R. Steinberg, *Carpal Tunnel Syndrome*, MERCK MANUAL (last modified May 2020), https://www.merckmanuals.com/professional/musculoskeletal-and-connective-tissue-disorders/hand-disorders/carpal-tunnel-syndrome?query=phalen%27s%20test.

supported by substantial evidence as reflected by the ALJ's own summary of variable findings. (Tr. 30) (emphasis added).

And while Vazquez alleged disability due to various impairments, the ALJ failed to expressly treat fibromyalgia any differently, as directed by SSR 12-2p. One cannot discern from the ALJ's broad rejection of Vazquez's statements what exactly the ALJ found to be unsupported or inconsistent. The court can only assume the ALJ treated Vazquez's statements about all of her impairments equally during the two-step process for analyzing Vazquez's symptoms. (Tr. 30). So, the court must assume the ALJ specifically found Vazquez's statements about her fibromyalgia symptoms inconsistent with the objective evidence. Yet, the ALJ does not account for "SSR 12-2p's recognition that physical examinations will usually yield normal results." *Catalan v. Berryhill*, No. 8:17-cv-1425-T-30MAP, 2018 WL 4055340, *3 (M.D. Fla. Aug. 9, 2018), report and recommendation adopted, No. 8:17-cv-1425-T-30MAP, 2018 WL 4052276 (M.D. Fla. Aug. 24, 2018). Any inconsistencies "are less remarkable when viewed in light of the longitudinal record and when considering the fact that the symptoms of fibromyalgia can wax and wane so that a person may have 'good days and bad days.'" *Id.*

Often, evidence of variable findings provides substantial evidence to find a claimant's subjective statements inconsistent. Yet, the administration and courts have recognized that fibromyalgia is unique, thus prompting SSR 12-2p's

framework. Not only is the accuracy of the ALJ's statement about "consistently" normal findings undermined by his own summary of the record, but it fails to account for SSR 12-2p's framework for considering fibromyalgia. The ALJ failed to recognize the waxing and waning character of fibromyalgia symptoms and the fact that often there is a lack of objective evidence for this impairment.

### 2. *Level of medical treatment, including the frequency and nature of treatment and medications*

The ALJ also found Vazquez's statements inconsistent with her medical history because "the record does not reflect the level of medical treatment one would expect for a disabled individual. For instance, the claimant rarely sought or received treatment, and the treatment received was relatively conservative." (Tr. 30). Vazquez notes that the ALJ does not explain what level of medical treatment would be expected "for a disabled individual." (Doc. 27, p. 31). And as noted in the previous section, the ALJ makes these observations without distinguishing among the impairments, which is particularly problematic for fibromyalgia.

As for Vazquez's fibromyalgia, the record shows she visited her providers generally once a month, and sometimes multiple times a month. (*See generally* Doc. 27, pp. 4-26 (summary of medical evidence and opinions)). The first treatment record—in December 20, 2016, from Lewis Caldrone, ARNP—noted Vazquez reported a ten-year history of upper and lower joint pain and swelling, constant fatigue, headaches, hand numbness, episodic constipation/diarrhea, epigastric pain,

and chills. (Tr. 445; *see also* Tr. 425 (treatment note by Chelsey Scheiner, D.O. on January 9, 2017, noting Vazquez "has been dealing with arthralgias for the past [ten] years"). During a June 21, 2017 visit, rheumatologist Marilu Colon-Soto, M.D. diagnosed fibromyalgia—this appears to be the first instance in which Vazquez was diagnosed with this impairment. (Tr. 481-482).

Vazquez has a lengthy history of being prescribed various medications (including titrations)[8] related to her fibromyalgia and related complaints. (Tr. 471, 475, 477, 482, 493, 501, 510, 546, 549, 560, 564, 566, 574, 608, 691, 695, 699, 702, 746, 870, 890-891, 895, 919-920, 974-975, 1062, 1144). But Vazquez did not always take her mediations as prescribed, apparently because they were either not effective, had unwanted side effects, or Vazquez simply discontinued them prematurely. (Tr. 429, 483, 494, 527, 545, 566, 584, 587-588, 614, 697, 701, 736, 743, 746, 885, 918, 974, 989, 993, 1103, 1055). On one occasion, Vazquez reported that "she knows she needs to be on medications, but she has tried several medications that did not work and she does not want to be a 'guinea pig' by trying out different medicines." (Tr. 750 (May 7, 2019)).

---

[8] "Drug titration is a way for clinicians to personalize medication doses so that patients can obtain the intended benefits of the treatment of their disease while minimizing side effects. This can occur by increasing the dose of a medication over time (up-titrating) until symptom relief occurs or a certain laboratory value is met, indicating that the most appropriate dose for that patient has been found." Aisling R. Caffrey, Eric P. Borrelli, *The art and science of drug titration*, SAGE JOURNALS (Jan. 19, 2021), https://journals.sagepub.com/doi/full/10.1177/2042098620958910.

And throughout the relevant time period, Vazquez often reported full-body pain, arthralgia, myalgia, fatigue, and cognitive issues as her primary symptoms without significant variation, although there was some improvement with medications and interventional pain management. (*E.g.*, Tr. 432-433 (4/5/2017; day two of taking prednisone with no improvement); 475 (5/21/2017; Tylenol noted to be "effective" but "[o]verall disease activity is worse"); 527 (10/18/2017; finding on examination "more than 8 tender points consistent with fibromyalgia" and noting Vazquez previously "tried gabapentin and Cymbalta which she was unable to tolerate and recently received steroids also" but was on no medications at the time of examination); 429 (10/23/2017; Elavil and Gabapentin noted not to be very effective; reported joint pain, muscle aches, fatigue; examination was positive for arthralgias and myalgias); 494 (11/10/2017; Vazquez "literally reports pain in every part of her body, she is not doing any exercise, the patient stopped the Cymbalta because it was making her very sick, patient was started by neurology on amitriptyline 25 mg at bed time, she has taken the medication for several weeks now without improvement."); 556-560 (12/18/2017; complains of "chronic pain involving the neck, tailbone, knee, joints, shoulders bilaterally" but noted Vazquez "has previously been started on several medications targeted for treatment of fibromyalgia. The patient has not taken most of these medications for a sufficient duration to optimize effect"; started on trial of Lyrica 50 mg at bedtime and up titrate

20

to three times per day); 561-566 (1/17/2018; complains of lower back pain, mid-back pain, joint pain, left knee pain; nothing alleviates pain; her need for medication is unchanged and there were no reported side effects; instructed to take Lyrica 3 times per day as well as methocarbamol/Robaxin 500 mg three times per day as needed for muscle spasms); 536-538 (2/1/2018; noting current medications were amitriptyline 25 mg at bedtime, Lyrica 50 mg every 12 hours, Methocarbamol 500 mg at bedtime, and Nexium 22.3 mg as needed; chief complaint was fatigue and pain involving her "entire body" but provider found no positive trigger points on examination); 569-574 (3/29/2018; noting Vazquez "denies any significant side effects from the analgesic regimen, and there is no outward maladaptive/aberrant behavior. She is able to function well on the analgesic regimen."; but finding on examination Vazquez was positive for arthralgias and back pain; discussed one final up titration of Lyrica); 503 (4/4/2018; reporting severe pain despite being on Lyrica 50 mg two tablets at night and despite just having had trigger point injections and following well with pain management); 584, 865-867 (5/7/2018; reported some benefit with Lyrica but still reported multifocal chronic diffuse pain; continued on Lyrica and started trial of Meloxicam 7.5 mg daily); 885-887 (6/28/2018; "Patient states that her all-over body pain had increased since her last visit and current medications aren't effectively controlling her pain symptoms." Reported pain score of 7 (severe)); 1055 (7/5/2018; reports no improvement of pain with her medication;

examination was positive for arthralgias and myalgias); 701 (8/1/2018; complaining of severe body aches and pains; still on Lyrica and Meloxicam); 911-916, (8/30/2018; reported pain score of 3 (mild) while on Lyrica three times daily (100 mg + 100 mg + 50 mg) and 7.5 mg meloxicam daily, although Vazquez "has reported taking [Lyrica] differently or not taking [it] at all"); 941-946, (11/8/2018; reported pain score of 2 (mild)); 1074-1075, (11/12/2018; noted Vazquez was on Lyrica and Meloxicam and she follows with pain management; "She is having and active life style and denies any worsening of the pain, Lyrica alleviated her pain"; examination was positive for arthralgias but negative for back pain, gait problem, joint swelling, myalgias, neck pain and neck stiffness); 689 (11/26/2018; noting Lyrica has "helped her quite a bit" and there was a significant difference in her pain level when she was told not to take her medication prior to the carpel tunnel surgery and had a lot of generalized body aches and pains); 971-975 (2/22/2019; substituted Zoloft for Cymbalta 60 mg for both "fibromyalgia symptoms and to [help] with underlying depressive/dysphoric mood"); 1094-1099 (5/13/2019; unchanged from 11/12/2018 except examination was negative for arthralgias, back pain, gait problem, joint swelling, myalgias, neck pain and neck stiffness; normal range of motion, exhibits no edema, tenderness or deformity; and is alert and oriented to person, place, and time); 1140-1145 (6/3/2019; unchanged from 5/13/2019 except positive for arthralgias and myalgias).

22

Vazquez claims she was ultimately maintained on Lyrica 150 mg three times daily, Meloxicam, Effexor 150 mg, and muscle relaxers as needed. (*See* Doc. 27, p. 32 (citing Tr. 537, 566, 695, 702, 736, 740, 1103)). During the September 12, 2019 hearing before the ALJ, Vazquez testified that her medications and dosages were adjusted and changed over time. She stated that she was taking approximately seven different medications, and that she takes Lyrica (for fibromyalgia) three times per day. (Tr. 80).

Besides medications, Vazquez attempted to treat her fibromyalgia by other means. Pain management specialist David Greschler, M.D., recommended physical therapy during a December 18, 2017 new patient consultation. (Tr. 556, 560). Then, on March 14, 2018, Vazquez contacted her rheumatologist Romy Aranguiz, M.D., regarding physical therapy because "her neurologist stated that she should not have physical therapy due to her condition" and "should consult her rheumatologist about this." (Tr. 1032). Dr. Aranguiz responded that physical therapy is one of the recommended therapies for fibromyalgia, and "she can have all the [physical therapy] she gets." (Tr. 1032). After a few months, Dr. Greschler noted on May 7, 2018, that Vazquez completed physical therapy, which was "no longer being covered by insurance." (Tr. 584, 919).[9]

---

[9] In response to Vazquez's argument that she was exploring physical therapy as a treatment modality, the Commissioner argues that she failed to cite evidence of actual physical therapy treatments. (Doc. 27, pp. 32, 43). While it is true the record does not contain records from physical therapy, Vazquez did summarize the evidence and note that one record suggests Vazquez completed physical therapy at some point before

In addition, on March 29, 2018, Vazquez received six trigger point injections for fibromyalgia symptoms. (Tr. 571, 574-576). Days later, on April 4, 2018, Vazquez reported severe pain despite the trigger point injections (Tr. 503, 1039).

The ALJ's characterization of the record as being "limited," and treatment as occurring "rarely" is not supported by substantial evidence. (Tr. 30). There are plenty of records pertaining to Vazquez's fibromyalgia and related symptoms. And characterizing Vazquez's treatment as "conservative" is not supported given the many different drug trials as well as the amount and doses (including titrations) of medication she has taken for fibromyalgia. The ALJ does not explain what level of medical treatment would be expected "for a disabled individual" beyond Vazquez's treatment with a general practitioner, neurologist, rheumatologist, pain management specialist, psychiatrist, psychotherapist, orthopedic surgeon, and gastroenterologist for evaluation (MRI, x-ray, EMG/NCV, EEG, serology, endoscopy/colonoscopy) and treatment including medication management, hand surgery, and pain management injections.

The ALJ further stated that Vazquez "takes medication for the alleged impairments, which weighs in [her] favor, but the limited medical record reveals that when compliant, the medications have been relatively effective in controlling [her]

_____

May 2018. In a July 2, 2018 supplemental pain questionnaire, Vazquez also stated she went to physical therapy "but my Medicaid plan no longer want[ed] to pay." (Tr. 327).

24

symptoms." (Tr. 30). Vazquez's symptoms during the series of medication trials were both variable and relative. The ALJ's statement that medications were relatively effective in controlling Vazquez's symptoms ignores the series of drug treatments and titrations Vazquez underwent throughout the relevant time period. Even when she was maintained on Lyrica and Meloxicam and other medications, her symptoms were variable, which is consistent with the nature of fibromyalgia. Indeed, symptoms of pain can wax and wane. And any records later in time indicating Vazquez's medications were "relatively effective" are less remarkable in light of the longitudinal record. SSR 12-2p, 2012 WL 3104869 at *6.

The decision discounts Vazquez's statements regarding intensity, persistence, and the limiting effects of her fibromyalgia and related symptoms, but it does not follow (nor even mention) SSR 12-2p's criterion for assessing fibromyalgia. *See Catalan v. Berryhill*, No. 8:17-cv-1425-T-30MAP, 2018 WL 4055340, *3-4 (M.D. Fla. Aug. 9, 2018), *report and recommendation adopted*, No. 8:17-cv-1425-T-30MAP, 2018 WL 4052276 (M.D. Fla. Aug. 24, 2018) (remanding where the ALJ did not evaluate fibromyalgia under SSR 12-2p's framework when discounting the plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms).[10] This is reversible error.

---

[10] The parties also discuss the ALJ's treatment of an opinion from James Seltzer, M.D., a non-examining state agency consultant. (Doc. 27, pp. 33-34, 45-46). Vazquez does not challenge the ALJ's treatment of the agency opinions, thus any argument to this effect is waived. *See, e.g., Sanchez v. Comm'r of Soc. Sec.*, 507 F. App'x 855, 856 n.1 (11th Cir. 2013) (holding claimant waived arguments by not expressly

## III. Conclusion

Upon consideration of the submission of the parties and the administrative record, the court finds the decision of the Commissioner is not supported by substantial evidence.

It is **ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED** for further consideration pursuant to sentence four of 42 U.S.C. § 405(g). "Any issues relating to the claim(s) may be considered by the Appeals Council or administrative law judge whether or not they were [previously] raised in the administrative proceedings." 20 C.F.R. §§ 404.983(a), 416.1483(a). The clerk of court is directed to enter judgment, terminate any pending motions and deadlines, and close the case.

**ORDERED** on March 29, 2022.

_Nicholas P. Mizell_
NICHOLAS P. MIZELL
UNITED STATES MAGISTRATE JUDGE

---

challenging ALJ's findings). Rather, Vazquez argues that even though Dr. Seltzer considered the longitudinal record and the ALJ found his opinion persuasive, this is no substitute for the ALJ properly considering Vazquez's fibromyalgia-related limitations. (Doc. 27, pp. 33-34). The court agrees with Vazquez. SSR 12-2p requires the *ALJ* to consider the longitudinal record.